In the

# United States Court of Appeals
## For the Seventh Circuit

Nos. 05-3379, 05-3645, 05-3648, 05-3667 & 05-3739

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

DEANGELO MCMAHAN, BRIAN NELSON,
ANTONIO MCMAHAN, DESHUN SMITH,
and GINO MCMAHAN,

*Defendants-Appellants.*

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 04 CR 423—**Amy J. St. Eve**, *Judge.*

ARGUED MAY 30, 2007—DECIDED JULY 20, 2007

Before EASTERBROOK, *Chief Judge*, and RIPPLE and
EVANS, *Circuit Judges.*

EVANS, *Circuit Judge.* The five defendants in this case
were part of a long-term, well-established drug business
near the corner of Washington and Waller on the west side
of Chicago. In particular, they operated out of a clothing
store called 600 Collections. They were pretty much a full-
service operation, selling heroin, cocaine, cocaine base,
and marijuana. The operation began in 1988 and contin-
ued until, through wiretaps on cell phones, surveillance of
the locations, informants, and other investigative prac-
tices, agents of the Federal Bureau of Investigation, the

Drug Enforcement Administration, and the Chicago Police Department put them out of business in 2004. They were charged in count 1 of an 11-count second superseding indictment with conspiracy to possess with the intent to distribute narcotics, in violation of 21 U.S.C. § 846. Other charges against them individually and in various combinations include substantive distribution counts, in violation of 21 U.S.C. § 841(a)(1), and using a communication facility to commit a drug trafficking crime, in violation of 21 U.S.C. § 843(b).

Four of the defendants, all except DeAngelo McMahan, were convicted of conspiracy. In addition, Antonio McMahan was convicted of distribution of cocaine, two counts of distributing heroin, and three counts of violating § 843(b). He was acquitted on one distribution count. He was sentenced to a prison term of 324 months. In addition to conspiracy, Deshun Smith was convicted of two counts of § 843(b) violations. He was sentenced to 92 months in prison. Gino McMahan was convicted of conspiracy and a substantive count of distribution of cocaine. He was acquitted of two § 843(b) charges. His prison sentence is 312 months. Brian Nelson was convicted of conspiracy but acquitted of two counts of § 843(b) violations. He was sentenced to 250 months in prison. Finally, DeAngelo McMahan—as we said—was acquitted of the conspiracy charge as well as one count of violating § 843(b). He was convicted of one § 843(b) charge. His sentence is 48 months.

The defendants raise a number of issues on appeal, many of which are applicable to all of them.

The first issue involves testimony about wiretap procedures. Defendants contend that admission of certain testimony of Special Agent Mark Horton of the FBI, the case agent in charge of this investigation, was an abuse of discretion. Part of Horton's testimony set out the proce-

dures used to obtain approval to wiretap a suspect's telephone conversations. Under these procedures, the agents prepare an affidavit in support of a request for a court order allowing the wiretapping. The affidavit is reviewed by the local United State's Attorney's office, after which it is sent to the Department of Justice in Washington for its approval of the request. After DOJ approval is received, the request is presented to the chief judge of the relevant district for consideration. If an order allowing the interceptions is signed, monitoring can begin. Horton went on to explain that every 10 days a report must be prepared for the chief judge's review to see whether the wiretaps reveal criminal activity so that the interception can continue. Horton testified that there were wiretaps on five different cell phones from December 2003 to March 2004.[1] The jury instructions stated that the wiretap conversations "were legally intercepted by the government."

Defendants are correct that our decision in *United States v. Cunningham*, 462 F.3d 708, 709-10 (7th Cir. 2006), holds that testimony almost identical to Horton's was inadmissible. We said that the testimony

> suggested to the jury that a panel of senior government lawyers in the Office of the Attorney General in Washington, D.C. and others in law enforcement were of the opinion that there was probable cause to believe the defendants were indeed engaging in criminal activity. The admission of this irrelevant evidence had the effect of improperly bolstering the credibility

---

[1] A wiretap order allows monitoring for a maximum of 30 days. There were several orders in this case running from December 15, 2003, to January 13, 2004; from January 16, 2004, to January 26, 2004; from January 28, 2004, to February 3, 2004; and from February 9, 2004, to March 9, 2004.

> of the government's case in the eyes of the jury, and the error was not harmless.

The difference between that case and this one, however, is that in *Cunningham* there was an objection to the testimony, making our review for an abuse of discretion. Here—though defendants argue otherwise—there was no objection. For that reason, our review is only for plain error, a much harder row for the defendants to hoe.

In an attempt to escape plain error review, the defendants argue that (1) a motion in limine the government filed before trial and (2) an objection on another basis lodged somewhat late in the testimony require a finding either that no objection was needed at trial or that, in fact, an objection was made. We cannot agree with either proposition.

The government's motion in limine sought to preclude testimony challenging the legality of the wiretaps. The district judge (Amy J. St. Eve) ordered that

> [t]he government's motion to preclude testimony regarding the legality of the Title III wiretap is granted. Defendants have not challenged the legality of the Title III wiretap in court. If they wish to challenge the legality of the wiretap, the only proper way to do so is to raise it with the court, not the jury.

The defendants say that this order sufficiently preserves the issue of Horton's testimony for appeal. Unfortunately for them, it does not.

In *Wilson v. Williams*, 182 F.3d 562 (7th Cir. 1999), we considered the circumstances under which a pretrial objection eliminates the need for a simultaneous objection at trial. The concern surrounding the issue is at least two-fold—to prevent trapping an unwary attorney who doesn't repeat at trial an objection he raised before trial and, at the same time, to prevent both the judge and the adver-

sary from being sandbagged and allowing preventable errors from occurring. We said that only "arguments that were actually presented to the district court before trial are preserved for appeal—and then only if the district judge came to a definitive conclusion." At 567. We added that a "ruling on a particular *use* of evidence does not preserve an objection to a different and inappropriate use." *Id.*

In the present case, the government's motion in limine, which sought to preclude testimony regarding the legality of the wiretap, does not preserve for the defense an objection to testimony regarding the process for obtaining a wiretap order. The testimony Horton gave deals with the wiretap application process, not the ultimate legality of the wiretaps. The testimony did not delve into the affidavits in support of the application and the facts on which the government claimed it had probable cause for a warrant. The order the judge issued merely informed the defendants that if they wished to suppress the wiretap evidence in this case, they had to do so by filing a motion to suppress for her consideration. The issue could not be raised before the jury. The order did not preserve the issue of the inadmissibility of Horton's testimony.

The defendants also claim that they did, in fact, object to the testimony. The best that can be said for this claim is that there was an objection *during* the testimony. But it was not lodged when the testimony began and it was not on point. What happened was that, in response to questioning, Horton set out the procedures for obtaining the wiretap. The prosecutor then asked him about the 10-day review process:

> Q. Now, as the calls are being—began to be recorded on this wiretap that we're discussing, did you make a determination as to the content of the calls in order for the interception to continue past that ten-day mark or within that ten-day mark?

A.  Yes.

Q.  And what was that determination on the wire-
tap—the first wiretap?

A.  That criminal conversations were—

MR. BOYD:  Objection.

MR. COLLINS:   Objection, Judge.

MR. BOYD:  Conclusion, Judge.

THE COURT: Sustained.  .  .  .  Rephrase your
question.

The inadequacy of these objections to preserve the issue before us is self-evident. The objection gives no indication to the judge that the defense is claiming that the entire line of questioning is improper. And so, because there was no proper objection to the testimony, our review is for plain error. *United States v. Gray*, 410 F.3d 338 (7th Cir. 2005).

For us to find plain error, the defendants must show (1) error, (2) that is plain, (3) that "affects substantial rights," and (4) that "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." *Gray*, at 345; *United States v. Olano*, 507 U.S. 725 (1993).

The first two requirements are met: there was error and it was plain. The problem for the defendants is that the testimony cannot be said to have affected their substantial rights, nor did it affect the fairness and integrity of the trial. The evidence of the defendants' criminal activity was substantial. It showed a conspiracy among Antonio and Gino McMahan, Smith, and Nelson. Gregory Hudgins, Carlos Cayton, and Melvin Johnson, all of whom worked with the defendants at one time or another, provided testimony about the history of the drug spot at Washington and Waller. Hudgins, Melvin Johnson,

Demond Williams, and Maurio Young testified to drug deals or gun deals at 600 Collections. The jury heard dozens of calls in which the defendants discussed their drug business—in code, it is true. But the code is decipherable. In addition, there was testimony from buyers about three of the individual distribution counts, wiretap evidence, and evidence from surveillance agents. Finally, there were post-arrest statements from each defendant. In contrast, none of the evidence came from the affidavits filed in support of the wiretap applications. There was no further reference to Horton's testimony regarding the procedures, other than that made in his cross-examination. All in all, although it was error to admit the testimony, the defendants have not met their burden under the plain error standard.

The defendants also contend that the denial of their challenge, pursuant to *Batson v. Kentucky*, 476 U.S. 79 (1986), to the prosecution's striking of an African-American juror was clearly erroneous.

The jury selection procedure in this case involved the seating of all prospective jurors in the courtroom. From that group, 16 were called to the fore and questioned regarding their background and ability to be impartial. After they were questioned, the parties could move to strike jurors for cause. A number of requests were granted. The parties then exercised peremptory challenges, after which six jurors remained to be empaneled. The process was repeated until the jury was chosen.[2]

---

[2] The jury selection process used requires the attorneys to exercise peremptory challenges before they know what other problems might show up in the remainder of the venire. Although we are not saying that the process is legally infirm, it would seem to us to place the attorneys in an unnecessarily difficult

(continued...)

The first peremptory strike exercised by the government was of a young African-American man. The defense immediately raised a *Batson* challenge, and the government was asked to state its reasons for the strike:

> First and foremost—and, most importantly—he lives on Chicago's West Side.
>
> It was reported, although we did ask the follow-up question with the Zip Code—and, unfortunately, none of us were able to place that Zip Code—as to whether or not it was the area of Washington and Waller. We still had concerns.
>
> Those concerns were, then, seconded by a comment that was reported to us by Agent Helen Dunne, from some individuals who appear to be here perhaps because they are relatives or friends of the defendants; a comment that was remarked—that she overheard—where they said, "Oh, that's a good Zip Code." That gave the government some concerns.
>
> Secondly, he has stated that he has a number of friends who have been arrested; and, while the government recognizes that we did not—or we would have run out of pre-emptories if we had exercised all arrests—it seemed like there were—the numerous nature of these individuals that gave the government concerns.
>
> And, for those reasons, we exercised a pre-emptory challenge.

In response to this explanation, the defense highlighted a number of facts and arguments: that the government did

---

[2] (...continued)
position, which could be eliminated by the exercise of peremptory strikes after all the jurors were questioned.

not strike all people with arrests in their backgrounds; that living on the west side of Chicago was not a good basis for a strike; that the Zip Code in which the potential juror said he lived was not the Zip Code of the site of the drug dealing in this case; and that another potential juror, who was white, had a brother in a correctional institution on a drug charge, yet he was not stricken. The prosecutor defended the decision not to strike the latter prospective juror because he seemed to have a distant relationship with his brother. Judge St. Eve pointed out that she excused for cause one person whose son had been nearly fatally beaten over a drug debt. Saying that the government had offered appropriate race-neutral reasons for their strike, the judge denied the *Batson* challenge. In a later written decision, she explained further, saying she carefully evaluated the demeanor of both the attorney exercising the challenge and of the excused juror. She concluded:

> The government identified a number of race-neutral factors for exercising a peremptory strike on Mr. Pryor. The Chicago Police Department ("CPD") had arrested Mr. Pryor the prior year for gambling. The charges were ultimately dropped. Although Mr. Pryor said that he thought the CPD had treated him fairly, the Court questioned his veracity when he answered this question. In addition, several of Mr. Pryor's friend[s] had been charged with crimes involving drugs and weapons. Some of them were also convicted of these crimes. The charges in this case involve drugs and weapons. Finally, Mr. Pryor lived on the west side of Chicago, the same general location where the Defendants' activities in question took place. Looking at the totality of Mr. Pryor's responses, the Court found that the government had offered a race-neutral reason for striking Mr. Pryor.

*Batson* involves a three-step analysis. First, the defendants must establish a prima facie case of discrimination. Next, the prosecutors must offer a race-neutral explanation for the strike. Finally, the defendants must prove the reason offered is pretextual. It is not necessary for a defendant to show an exactly identical white juror who was not removed. *Miller-El v. Dretke*, 545 U.S. 231 (2005). Our review is for clear error. *United States v. James*, 113 F.3d 721 (7th Cir. 1997).

We agree with the district judge that the prosecution offered race-neutral reasons for the strike, in fact, quite convincing explanations for the strike. The defense has not shown that the reasons were pretextual. That the reasons are not pretextual is supported as well by the fact that three black jurors were empaneled as the jury selection process continued.

Defendants also contend that the government's closing argument violated their right not to testify and that their motion for mistrial was improperly denied. Our review is for an abuse of discretion. *United States v. Aldaco*, 201 F.3d 979 (7th Cir. 2000).

During cross-examination of Special Agent Horton, counsel for defendant Nelson implied that there were many telephone calls the government failed to present to the jury. Later, during closing arguments, defense counsel said that the calls the jury heard were merely a small number of the 11,000 calls recorded.[3] She claimed the calls were out of context and there were intervening calls which might entirely change the meaning of the calls presented. In rebuttal, the prosecutor stated that the defense had all 11,000 calls and that if they wanted

---

[3]  A statement that might merely have made the jury grateful to the government.

them played they could play them. At that point, defendants objected, saying the government was shifting the burden of proof; they moved for a mistrial. Judge St. Eve denied the motion but instructed the jury on the burden of proof.

In reviewing a district court's denial of a motion for a mistrial based on statements made in closing arguments, we must determine whether the prosecutor's arguments, when viewed in isolation, were improper; and if the comments are found to be improper, whether in light of the record the remarks deprived the defendant of a fair trial. *Aldaco*.

The prosecutor did not improperly comment upon any defendant's failure to testify. While a prosecutor cannot comment on a defendant's failure to present evidence in situations in which the defendant is the only person who could have supplied the evidence, pointing out the failure to present evidence other than the defendant's testimony does not implicate the privilege against self-incrimination. *United States v. Sblendorio*, 830 F.2d 1382 (7th Cir. 1987). Here, the comment corrected the implication in counsel's closing which might have left the jury with the impression that defendants were at the government's mercy as to which tapes were played. The government is allowed to correct such misinformation. It was not necessary for a defendant to testify in order to present the tapes. The fact is that the defense had access to the tapes and could have played any, assuming they were relevant, that could have cast doubt on their guilt. The prosecutor's comments were not improper.

Neither did the comment shift the burden of proof. The comment simply rebutted the implication that the government was hiding something from the jury. Furthermore, immediately after the comment, the judge stopped everything and instructed the jury as to the burden of proof.

When the prosecutor resumed her argument, she repeated the proper burden of proof. Even if the comment could somehow be said to be improper, looking at the record as a whole, we see no basis for saying that the denial of a motion for a mistrial on this issue was an abuse of discretion.

Antonio McMahan contends that his constitutional rights were violated by the admission of post-arrest statements of Gino McMahan and Nelson. We review such questions *de novo*. *United States v. Hernandez*, 330 F.3d 964 (7th Cir. 2003).

Before trial, Antonio McMahan filed a motion to sever his trial from the others, raising this issue. The district judge found that any problem arising in this case under *Bruton v. United States*, 391 U.S. 123 (1968), could be corrected by redacting the statements per our decisions in *United States v. Souffront*, 338 F.3d 809 (7th Cir. 2003), and *United States v. Ward*, 377 F.3d 671 (7th Cir. 2004). We agree. And, in fact, references to McMahan were redacted from the statements.

McMahan's argument, though, also is that the government "made a mockery of the protections afforded by the Sixth Amendment . . . in the way they tailored the presentation of their evidence." His example is that Nelson's statement was to the effect that he did not have an expensive car and that he had been arrested for moving drugs for other individuals. McMahan says that immediately after Nelson's statement was presented, the government showed the jury a photograph of McMahan's expensive car and that immediately before Nelson's statement was introduced, the government played calls regarding instructions McMahan was giving Nelson. Similarly, Gino McMahan's statement contained references to Shawanda Dunbar, and immediately after that statement was introduced, calls between Dunbar and Antonio

were introduced. Antonio McMahan argues that the government tailored its evidence to do exactly what *Bruton* was designed to prevent.

We simply cannot buy into this fanciful argument. Antonio McMahan does not contend that the photograph of the car or the calls could not have been introduced at some point in the trial. It is the timing which he contends skirts *Bruton*. We will not analyze the order of the evidence to see whether it raises unfair inferences of guilt.

Another evidentiary issue involves allegedly hearsay statements and testimony from law enforcement agents about their assignments.

Two law enforcement officers were asked what sort of work they did. Special Agent Horton said he primarily investigated violent street gangs and that some of his cases include drug cases. Officer Sal Colello testified that his past work with the Chicago Police Department was as a gang crime specialist but that he had been assigned to the FBI as a task force officer. He said that with the FBI he participated in gang and narcotics investigations. From these questions regarding the background of the two officers, the defendants, relying on *United States v. Irvin*, 87 F.3d 860, 864 (7th Cir. 1996), argue that here, as in *Irvin*, there is a "substantial risk of unfair prejudice attached to gang affiliation evidence, noting such evidence 'is likely to be damaging to a defendant in the eyes of the jury . . . .'" What the defendants do not point out is that *Irvin* also says that, under "appropriate circumstances," gang evidence has probative value, warranting its admission.

So *Irvin* does not forbid all gang evidence. But, more importantly, nothing about *Irvin* is particularly relevant in the present case. *Irwin* dealt, as it says, with "gang evidence"—that is, the defendant's membership in a gang, the Diablos motorcycle gang. The evidence included

testimony about a large gang tattoo on a defendant's back, two rings (one which said Diablos and one with a devil's head), a picture of a vest with gang insignia, a Diablos "greeting card," a Diablos wallet, and other gang-related personal effects. One defendant testified that a motorcycle gang would kill him if he testified. The evidence in *Irvin* was found to be prejudicial and not harmless. The evidence in the present case cannot be compared in any meaningful way with that in *Irvin*. Here, the officers said they did gang investigations; they did not say that is all they did. They did not say that the defendants were members of a gang. In total, the testimony lasted a few minutes in a two-week trial. The evidence was not unfairly prejudicial, but even were we somehow to find prejudice, we would also find the admission of the evidence harmless.

The other evidentiary error alleged is the admission of statements which defendants contend were irrelevant or were hearsay offered for the truth of the matter asserted. One statement was that of a cooperating witness, Demond Williams, who said that in 1999 he talked to Bryant Riddle who told him that he was dealing drugs with Antonio. The other statement was from another cooperating witness, Maurio Young, who testified that a friend of his said that Gino McMahan charged outrageously high prices for drugs. In this case, it was not an abuse of discretion to admit the statements. Such statements are admissible if they are offered to provide context for the testimony. *See United States v. Van Sach*, 458 F.3d 694 (7th Cir. 2006). And in any case, neither statement could have been said to affect the result of the trial. In addition, as to Riddle's statement, the jury was given a limiting instruction.

Next, the defendants claim they should have been granted a new trial based on newly discovered evidence. The evidence involved is subject to the requirements of *Brady v. Maryland*, 373 U.S. 83 (1963); consequently, we must determine whether, if disclosed, the evidence might

have changed the outcome of the trial. *United States v. Boyd*, 55 F.3d 239 (7th Cir. 1995).

The evidence involves two of the government's witnesses. Gregory Hudgins testified about his long-time drug dealing with some of the defendants. He was vigorously cross-examined about his past criminal activity. But the defense claims that it learned after trial about other evidence implicating Hudgins in the murders of Alvin Pruitt and a person nicknamed "K-Mart."

The other witness is Carlos Cayton. The defense learned that prior to trial the government had offered relocation assistance to Cayton's family because of threats made against them. The family declined. But during the trial, a few days before Cayton testified, the family decided to relocate and moved three days after Cayton testified. It was not until two and one-half months later that the defense learned of the relocation. Also, Cayton was in state custody during the trial. After his release from custody he, too, was provided relocation funds because of his fear of retaliation for testifying against the defendants.

The government's duty to disclose evidence favorable to the defense under *Brady* includes impeachment evidence. *Strickler v. Greene*, 527 U.S. 263 (1999); *United States v. Wilson*, 481 F.3d 475 (7th Cir. 2007). The failure to disclose evidence, however, does not automatically entitle a defendant to relief. A defendant may obtain relief only if the nondisclosure deprived him of a fair trial. *United States v. Bagley*, 473 U.S. 667 (1985). In order to obtain a new trial, a defendant must establish that the government did, in fact, suppress evidence; that the suppressed evidence is favorable to the defense; and that the suppressed evidence is material. As to the latter point, the nondisclosure must be so serious that there is a reasonable probability that the evidence would have resulted in

a different verdict. A probability of a different result is shown where the suppression undermines confidence in the outcome of the trial. *Kyles v. Whitley*, 514 U.S. 419 (1995).

Looking first to the additional evidence that Hudgins may have been involved in murders, we concur with the defense that such evidence is favorable to them in their attempt to impeach Hudgins. The problem is that they were able to cross-examine Hudgins at length about the murder of Pruitt and other acts of violence and drug dealing. As to the Pruitt murder, the attorney for Antonio McMahan engaged in the following exchange with Hudgins:

Q. Didn't a guy named Alvin Pruitt owe you about $4,000?

A. Yes.

. . . .

Q. And didn't you know that you were a suspect in his murder? He was murdered, right?

A. Yes.

Q. Didn't you know you were a suspect in his murder?

A. Yes.

Q. And you were real concerned about that, right?

A. Yes, because it wasn't true.

A few questions later:

Q. Is that your testimony? You were not involved in the murder of Alvin Pruitt in 2003?

A. That's correct.

Q. And the people who say you were have made that up; is that your testimony?

A. I guess so.

There is much other cross-examination, as well, about Hudgins' drug dealing, carrying guns, and violent behavior. There was also significant examination about Hudgins' plea agreement, entered pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure, which makes the agreed sentencing range binding on the district judge once the plea is accepted. Hudgins was eligible for a life sentence, but as a result of his agreement to testify, his sentence was to be between 13 and 17 years. In light of all this fodder for cross-examination, we cannot find that the failure to inform the defense about other evidence would have made a difference in the outcome of this trial. Hudgins was shown to have reaped considerable benefit from testifying; in addition, he was clearly shown to be a dangerous, unsavory character. We cannot conclude the withheld information would have resulted in a different verdict.

The claim regarding the relocation of Cayton's family is even less compelling. It is evidence which, as we say, cuts both ways. If counsel had cross-examined Cayton regarding the relocation of his family, the government would likely have been permitted to inquire about why the relocation was taking place—that is, that the family feared retaliation by the defendants. It is hard to see why such information would be beneficial to the defendants or could possibly lead to a different verdict. The motion for a new trial was properly denied.

Finally, we turn to sentencing issues—two of which are raised simply to preserve them. The first, raised by Antonio McMahan and Smith, involves the use of the preponderance of the evidence standard to make factual findings in order to determine the appropriate offense level under the United States Sentencing Guidelines. We decline to reconsider our decision in *United States v. Reuter*, 463 F.3d 792 (7th Cir. 2006). Antonio and DeAngelo McMahan, Smith, and Nelson also seek to

preserve an argument regarding the different treatment under the guidelines of crack cocaine and powder cocaine—the 100-to-one ratio. The Supreme Court has granted certiorari in *Kimbrough v. United States*, No. 06-6330 (U.S. June 11, 2007), which presents the question whether district judges must continue to use the 100-to-1 ratio, even if, as in *United States v. Miller*, 450 F.3d 270 (7th Cir. 2006), the judge prefers a different approach. The district judge in this case did not express dissatisfaction with the statutory ratio, so the appeal need not be held for *Kimbrough*, as appellants cannot benefit unless the Supreme Court were to hold that district judges *must* use a different ratio, and no such argument was advanced in the *Kimbrough* petition.

DeAngelo McMahan raises other issues regarding his sentencing. First, he alleges that his sentence should be vacated because the only count on which he was convicted was a telephone count in which the conversation related to a pound of marijuana, but nevertheless he was sentenced on the basis of 255 grams of cocaine base, an amount which depends on his involvement in the drug distribution conspiracy, of which he was acquitted. We review the district court's factual findings at sentencing for clear error and the application of the facts to the sentencing guidelines *de novo*. *United States v. Haddad*, 462 F.3d 783 (7th Cir. 2006).

The question is whether the distribution of crack cocaine is relevant conduct to the offense of conviction. Relevant conduct can be used to enhance a defendant's sentence if it is part of the same course of action or common scheme or plan that gave rise to his conviction. Relevant conduct must be established by a preponderance of the evidence. *United States v. Johnson*, 342 F.3d 731 (7th Cir. 2003). We look for a "strong relationship between the uncharged conduct and the convicted offense, focusing on whether the government has demonstrated a significant 'similarity,

regularity, and temporal proximity.'" *United States v. Ortiz*, 431 F.3d 1035, 1040 (7th Cir. 2005) (citations omitted).

During trial, Judge St. Eve of course heard evidence as to DeAngelo McMahan's involvement in the conspiracy. Despite hearing all the trial evidence, in considering the issue of whether McMahan could be held responsible for the distribution of crack, she also entertained extensive argument. She then made findings regarding McMahan's involvement in the distribution, saying she believed FBI Special Agent Jay Darin, who testified regarding the admissions made by McMahan. In addition, there were recorded conversations which showed McMahan's involvement in the distribution of crack. There is no basis for us to say that the finding—by a preponderance of the evidence—that McMahan was responsible for 255 grams of crack cocaine was clearly erroneous.

Neither is there error in the finding that DeAngelo McMahan's involvement with crack was relevant to his conviction on the telephone count. Two incidents can be considered part of a common scheme if they are connected by at least one common factor, such as "common victims, common accomplices, common purpose, or similar modus operandi." U.S.S.G. § 1B1.3(a)(2), App. Note 9. To assess whether two or more offenses are part of the same course of conduct, we look for a strong relationship between the two by examining "whether the government has demonstrated a significant 'similarity, regularity, and temporal proximity [between] the uncharged acts and the offense of conviction.'" *United States v. Acosta*, 85 F.3d 275, 281 (7th Cir. 1996). In this case, the telephone call on December 23, 2003, which provides the basis for his conviction, was temporally proximate to other calls relating to crack and to his cooking cocaine into crack. It was not error for the judge to find that there was a common course of conduct

on that night, which included the telephone conversation about marijuana and the cooking of crack.

DeAngelo McMahan also argues that sentencing him to the statutory maximum for his offense of conviction because of conduct of which he was acquitted violates his constitutional rights. We reject the contention. A sentence at the top of the statutory range does not punish a defendant for a crime he did not commit. *United States v. Masters*, 978 F.2d 281 (7th Cir. 1992).

Another contention involves a 2-level obstruction of justice enhancement. DeAngelo McMahan says there were insufficient facts on which to base the enhancement. We cannot agree. The findings on the issue were sufficient under *United States v. Dunnigan*, 507 U.S. 87 (1993). The judge compared the credibility of McMahan and Special Agent Darin and, as we said, specifically found the agent credible. Conversely, she found that DeAngelo McMahan testified untruthfully in that his testimony contradicted his earlier post-arrest statements; for that reason she found he made willful false statements. Further, she found that his version of events was diametrically opposed to that of other witnesses so that "one version had to be a lie." Continuing with the *Dunnigan* factors, she found that the false statements were material and were made under oath. It was not clearly erroneous to impose the obstruction of justice enhancement.

Brian Nelson also contends that he must be resentenced, both because of errors in the calculation of his criminal history and of drug quantities attributable to him. We agree.

And, in fact, as to the criminal history category, the government also agrees and concedes that the calculations were erroneous. The government does not concede, however, that an error occurred in the drug calculation.

Nelson was convicted on the conspiracy count. The jury found that he was responsible for less than 500 grams of cocaine, less than 5 grams of cocaine base, and less than 100 grams of heroin. The presentence report stated that he was responsible for 52.55 grams of crack, no cocaine, and 16.1 grams of heroin. At sentencing, the government urged that Nelson be held responsible for 1.5 kilograms of crack cocaine and 3 kilograms of heroin. The district court followed the recommendations in the presentence report.

The record is a bit hard to follow as to how the calculations were made. At one point at sentencing, Judge St. Eve said that "52.55 grams of crack cocaine can be attributed to Mr. Nelson, based on the arrests during the five occasions set forth in the Presentence Investigation Report . . . ." At first it appears that those arrests were the ones listed in the report on December 17, 1997, February 15, 1999, March 18, 1999, June 18, 1999, and March 26, 2003. Taken at face value, the amounts relevant to those arrests add up to about 41 grams of crack. But the judge upheld an objection to the June 18, 1999, amount on the basis that the drug seized was heroin, not crack, thus subtracting 2.4 grams. Then the report says on February 20, 2004, Nelson was arrested for possessing and selling crack cocaine. The amount on that day was 13.9 grams, bringing the total to 52.55 grams—or the amount relied on for determining the offense level. So the five arrests must include the one on February 20, 2004.

Nelson objects to the calculations on two grounds: one, that the amounts are gleaned from arrest reports which, relying on *United States v. Robinson*, 164 F.3d 1068 (7th Cir. 1999), he says are inherently unreliable. Then, as to the February 20, 2004, arrest, there is, he says, no evidence connecting these drugs to the conspiracy.

We are not convinced that these arguments were adequately addressed by the district judge, who seemed to

think that *United States v. Booker*, 543 U.S. 220 (2005), gave her more leeway in calculating the guideline range than she would have had prior to *Booker*. Her finding merely was:

> It is this Court's position, because the guidelines are not mandatory and are merely advisory, that I can look to arrest reports in determining and calculating drug quantities.

There is no basis, however, to conclude that something that may not have been reliable prior to *Booker* is suddenly an acceptable basis for a finding after *Booker*. To the contrary, we have made clear that the first step in post-*Booker* sentencing is a properly calculated guideline range. *United States v. Mykytiuk*, 415 F.3d 606 (7th Cir. 2005); *see also Rita v. United States*, 2007 WL 1772146 (June 4, 2007). The method for that calculation has not changed or become less demanding. *See United States v. Cunningham*, 429 F.3d 673 (7th Cir. 2005). It still requires "sufficient indicia of reliability" to support its "probable accuracy." *United States v. Taylor*, 72 F.3d 533, 543 (7th Cir. 1995); *see Shepard v. United States*, 544 U.S. 13 (2005). The basis for thinking the information is reliable needs to be explained. Accordingly, Brian Nelson must be resentenced.

In sum, except as to the sentence of Brian Nelson, the judgments of the district court are AFFIRMED. The sentence imposed on Brian Nelson is VACATED and his case is REMANDED for resentencing.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*