In the

# United States Court of Appeals

## For the Seventh Circuit

No. 10-1705

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

ADALBERTO SANTIAGO,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 04 CR 784-1—**Samuel Der-Yeghiayan**, *Judge.*

ARGUED APRIL 6, 2011—DECIDED JULY 11, 2011

Before FLAUM, EVANS and TINDER, *Circuit Judges.*

FLAUM, *Circuit Judge.* A jury convicted Adalberto Santiago of conspiracy to possess with intent to distribute and to distribute cocaine base, in violation of 21 U.S.C. §§ 841(a)(1) and 846, and 18 U.S.C. § 2, and of distribution of cocaine base, in violation of 21 U.S.C. § 841(a)(1). On each count, the district court sentenced Santiago to the 240-month mandatory minimum for offenses involving 50 grams or more of a mixture containing cocaine

base. *See* 21 U.S.C. § 841(b)(1)(A)(iii). The court ordered that the sentences run concurrently. Santiago appeals his conviction on two grounds: that the district court erroneously admitted gang affiliation evidence under Federal Rule of Evidence 403, and that the government presented insufficient evidence to establish that the substance at issue was "cocaine base" for purposes of § 841(b)(1). For the following reasons, we affirm.

## I. Background

In 2002, the Bureau of Alcohol, Tobacco, and Firearms ("ATF") and the Cook County Sheriff's department were in the midst of a three-year joint investigation into the Spanish Cobra street gang in Chicago. ATF case agent David Gomez coordinated that investigation, which targeted a number of Spanish Cobra members, including Felipe Padilla.

In September of 2002, Agent Gomez directed a confidential informant known as "Suave," a former Spanish Cobra himself, to arrange a drug deal with Padilla. During that transaction, which occurred on September 26, 2002, Agent Gomez posed as a suburban drug dealer named "Loquito." The original plan, as negotiated by Suave and Padilla, was for Agent Gomez and Suave to purchase four and a half ounces of crack cocaine from Padilla at Padilla's home. But, on the day of the deal, Padilla changed the location to a K-Mart parking lot, explaining that "Sabu" had the drugs there.

It is undisputed that Santiago's nickname is Sabu. At Santiago's trial, Agent Gomez testified that, as part

of the Spanish Cobra investigation, he had learned the identities of various Spanish Cobras by viewing photos of them and learning their nicknames. Therefore, when Padilla mentioned Sabu, Agent Gomez understood him to be referring to Santiago.

Agent Gomez and Suave drove to the K-Mart in Agent Gomez's vehicle, which was equipped with a camera and microphones. Numerous audio and video recordings from those devices were admitted at Santiago's trial. Padilla met Agent Gomez and Suave in the parking lot in his own vehicle, and told them that Sabu would be driving a green van. About an hour later, Agent Gomez observed a green van drive into the parking lot. He testified that, despite the fact that the van parked several car lengths away, he recognized the driver as Santiago.

Padilla got out of his vehicle and went to the window of the green van to speak with the driver. Padilla then walked over to Agent Gomez's vehicle, and spoke with Agent Gomez and Suave. That conversation was recorded by the microphones in Agent Gomez's vehicle, and a recording of it was played at trial. During the conversation, Padilla told Agent Gomez and Suave that they needed either to accompany Sabu to another location to get the drugs, or to give Sabu the money up front and he would go get the drugs. When Agent Gomez rejected those options, Padilla said "ya know he ain't gonna burn me man, right? That's Cobra folk. How the fuck you gonna burn Cobra folk?" At the trial, Agent Gomez explained that he understood Padilla to be

saying that members of the Spanish Cobras would not rip each other off, and therefore they could trust Sabu. Despite that reassurance, Agent Gomez refused. Eventually, the green van left to get the drugs. The van returned about 15 minutes later, and again, according to his testimony, Agent Gomez was able to identify the driver as Santiago.

Padilla went over to the green van and exchanged $2,750 in cash for the drugs. Agent Gomez, Suave, and Sabu remained in their respective vehicles. Therefore, no images or recordings of Sabu were captured by the devices in Agent Gomez's vehicle. When Padilla returned to Agent Gomez's vehicle, he handed a package to Suave and said that the drugs were "cooked, fresh off the lamb." Agent Gomez testified that he understood Padilla to be saying that the substance was crack cocaine.

Agent Gomez and Suave then drove away. At that point, Suave said that the green van was a Chevrolet Express, and Agent Gomez agreed. Suave also said he had observed the van's license plate number. Agents later obtained certified vehicle records indicating that that license plate belonged to a blue 1996 GMC Savana, which was registered to Santiago and his girlfriend, Mayra Hernandez. Agent Gomez testified that the 1996 GMC Savana and the 1996 Chevrolet Express have very similar body types.

About two years later, on September 2, 2004, Santiago was charged in a two-count indictment for his alleged involvement in the September 26, 2002 transaction. Count One charged Santiago with conspiracy to possess with

intent to distribute and to distribute 121.3 grams of mixtures containing cocaine base, in violation of 21 U.S.C. §§ 841(a)(1) and 846, and 18 U.S.C. § 2. Count Two charged him with distribution of 121.3 grams of mixtures containing cocaine base, in violation of 21 U.S.C. § 841(a)(1). On October 27, 2004, Santiago was charged in a superseding indictment, which added Padilla to each count.

In May 2006, the government discovered that the drugs from the September 26, 2002 transaction had been destroyed. Santiago filed a motion to dismiss the indictment based on the unavailability of the drug evidence, which the district court denied. On January 8, 2007, Santiago filed a motion in limine to bar the introduction of evidence concerning his gang affiliation, arguing that such evidence was not relevant under Federal Rule of Evidence 402, and was unduly prejudicial under Rule 403. The district court denied that motion as well.

Santiago's four-day jury trial began on January 22, 2007. During its opening statement, the government twice referenced the ATF's investigation of the Spanish Cobra gang. The government called Agent Gomez as its first witness. As described above, Agent Gomez made several references to the Spanish Cobras during his testimony. Those comments related to the Spanish Cobra investigation generally, his ability to identify Santiago as the driver of the green van, and Padilla's statement about "Cobra folk." Two of the government's remaining three witnesses—Investigator Jose Rosario and Sergeant

Marlon Parks, both of the Cook County Sheriff's Office—mentioned the Spanish Cobras once, each to explain that he was involved in the joint investigation in 2002.

The government's final witness was former Cook County Sheriff's Police Department chemist Nicole Wenzel, who had analyzed the drug evidence recovered on September 26, 2002, before it was destroyed. She testified that she performed two chemical tests that indicated that the narcotics were cocaine base.

At trial, phone records from Padilla's cell phone were admitted into evidence. Those records showed a number of calls between Padilla's phone and a cell phone registered to Santiago's girlfriend, which occurred on September 26, 2002, and the few days prior to that date. The records showed that Padilla called the girlfriend's cell phone shortly after he spoke with Suave to arrange the September 26th deal. They also showed nine calls between the two phones during the transaction on the 26th. Agent Gomez testified that he observed Padilla make numerous calls on the date of the transaction, which he understood at the time to be to Sabu.

During its closing argument, the government told the jury, "do not convict, let me repeat that, do not convict Adalberto Santiago because he is a member of the Spanish Cobras." The prosecutor went on to say that jurors could use the gang evidence "to understand the relationship between Santiago, Padilla and the CI," in considering Padilla's reference to "Cobra folk," and to "assess Special Agent Gomez's ability to identify Sabu." In the rebuttal portion of its closing, the government

made additional references to gangs, referring to Padilla and Santiago as "gang members" on two occasions, and referencing the gang twice in relation to the larger joint investigation.

The district court included a limiting instruction regarding the use of the gang evidence in the jury instructions. The instruction read: "During the trial, references were made to gangs or gang membership. Such evidence does not mean that the defendant committed the offenses charged in this case." The government and Santiago agreed to that instruction. The jury returned a verdict of guilty on both counts, as well as a special verdict finding that the narcotics in the case were 50 grams or more of mixtures containing cocaine base in the form of "crack" cocaine.

Santiago filed a motion for acquittal based on insufficient evidence and a motion for a new trial based on the admission of gang evidence. The district court denied each motion. On March 11, 2010, the district court sentenced Santiago to the mandatory minimum sentence of 240 months' imprisonment on each count to run concurrently.

## II. Discussion

### A. Admission of Gang References

Santiago's primary argument on appeal is that the district court erred in admitting evidence concerning the Spanish Cobras and his membership in that gang. According to Santiago, admission of the gang evidence

was improper under Federal Rule of Evidence 403 because its minimal probative value was substantially outweighed by its prejudicial effect. In light of "the trial judge's first-hand exposure to the witnesses and the evidence as a whole, and because of the judge's familiarity with the case and ability to gauge the impact of the evidence in the context of the entire proceeding," we review the district court's decision to admit the evidence for abuse of discretion. *United States v. Alviar*, 573 F.3d 526, 536 (7th Cir. 2009) (citation omitted).

We recognize that a jury is likely to associate gangs with "criminal activity and deviant behavior," such that the admission of gang evidence raises the specter of guilt by association or a verdict influenced by emotion. *United States v. Irvin*, 87 F.3d 860, 865 (7th Cir. 1996). In recognition of the prejudicial nature of gang affiliation evidence, "we examine the care and thoroughness with which a district judge considered the admission or exclusion of gang-involvement evidence." *United States v. Westbrook*, 125 F.3d 996, 1007 (7th Cir. 1997). But the risk of prejudice associated with gang evidence does not render it automatically inadmissible. In numerous cases, we have upheld the admission of gang evidence as more probative than prejudicial. *See United States v. Montgomery*, 390 F.3d 1013, 1018 (7th Cir. 2004) (admission of gang evidence proper to help establish motive); *United States v. King*, 627 F.3d 641, 649 (7th Cir. 2010) (admission of gang-related evidence is appropriate "to demonstrate the existence of a joint venture or conspiracy and a relationship among its members") (citation

omitted); *Clark v. O'Leary*, 852 F.2d 999 (7th Cir. 1988) (witness' membership in rival gang admissible for purposes of impeachment to show bias); *United States ex rel. Garcia v. Lane*, 698 F.2d 900 (7th Cir. 1983) (evidence of defendant's gang affiliation admissible to explain earlier inconsistent statement of witness due to fear of retaliation).

Evidence of Santiago, Padilla, and Suave's membership in the Spanish Cobras was necessary to help the jury make sense of Padilla's reference to "Cobra folk." Without an explanation of what "Cobra" meant, the jury would not have been able to understand the exchange between Padilla and Agent Gomez after the green van's first arrival in the parking lot. And omitting the recording of that conversation from the trial would have left the jurors to speculate why the individual in the green van showed up to a drug deal without the drugs.

Moreover, the "Cobra folk" statement was probative of the conspiracy charged in Count One. To prove the conspiracy charge under 21 U.S.C. § 846, the government was required to demonstrate more than a buyer-seller relationship between Santiago and Padilla. *United States v. Rivera*, 273 F.3d 751, 755 (7th Cir. 2001). It needed to show an agreement between the two to possess and distribute the cocaine base. *United States v. Suggs*, 374 F.3d 508, 518 (7th Cir. 2004). To determine whether a conspiracy exists, we look to a number of factors, including the level of mutual trust between the individuals. *Id.* The "Cobra folk" statement revealed Padilla's confidence that Sabu would not rip him off, and thus was

directly probative of the trust between Santiago and Padilla.[1]

Reference to Agent Gomez's involvement in the larger Spanish Cobras investigation was relevant to his ability to recognize the name Sabu and identify the driver of the green van as Santiago.

We recognize that some of the gang references at Santiago's trial may have been unneeded. In our view, Investi-

---

[1] We do not necessarily agree with the government's contention that, apart from the "Cobra folk" comment, gang membership evidence was essential to proving the conspiracy allegations set forth in Count One of the indictment. We have explained that common membership in a group gives rise to only a weak inference that two people are involved in a given activity where the group itself is not somehow connected to the activity in question. *United States v. Irvin*, 87 F.3d 860, 864 (7th Cir. 1996). The government did not present any evidence at Santiago's trial demonstrating that the Spanish Cobras, as an organization, are involved in the drug trade, and consequently "the probative value of the common gang membership in proving . . . a joint venture [between Santiago and Padilla] was minimal at best." *Id.* at 865. We reiterate that "[c]harging a drug conspiracy that involves gang members . . . does not give the government carte blanche to splash gang references throughout the trial." *United States v. Hardin*, 209 F.3d 652, 663 (7th Cir. 2000), *overruled on other grounds by United States v. Nance*, 236 F.3d 820 (7th Cir. 2000). But, here, evidence of gang membership was required to explain Padilla's comment, which itself was probative of the charged conspiracy. Therefore, the admission of the evidence was not error.

gator Rosario and Sergeant Parks could have avoided referring to the Spanish Cobras investigation. And the government's characterization of Padilla and Santiago as "gang members" in the rebuttal portion of its closing argument appears unnecessary. But we do not believe these references gave rise to "the danger of *unfair* prejudice that must be balanced against probity to determine the admissibility of evidence under Rule 403." *United States v. Thomas*, 86 F.3d 647, 653 (7th Cir. 1996) (emphasis in original). The evidence of Santiago and Padilla's gang membership "did not substitute for direct evidence that [they] actually joined the drug distribution conspiracy," and thus any unfair prejudice that might have resulted was limited. *Id*. For these reasons, we believe the district court was within its discretion in concluding that the probative value of the gang evidence outweighed its prejudicial effect.

Even assuming that a few of the gang references were more prejudicial than probative, their admission was harmless. As noted above, evidence that Santiago was a Spanish Cobra was properly admitted. Therefore, the jury was going to hear about his gang affiliation. Any impact of the additional statements regarding the gang had on the jury would have been very slight. *See United States v. Jung*, 473 F.3d 837, 842–43 (7th Cir. 2007) (erroneous admission of evidence is harmless "if we are convinced that the error did not influence the jury or only had very slight effect"). Furthermore, the evidence of Santiago's guilt was overwhelming. Agent Gomez testified that he was able to identify Santiago as the driver of the green van each time it arrived at the K-Mart

parking lot. Vehicle records show that Santiago owns a van similar to the one described by Agent Gomez. And phone records indicate that Padilla and Santiago (or his girlfriend) communicated prior to and during the transaction. Consequently, we conclude that any error was harmless. *See Jung*, 473 F.3d at 843 (erroneous admission of evidence harmless where evidence of defendant's guilt was overwhelming).

## B.  Sufficiency of Evidence Regarding Drug Type

Santiago also argues that the government presented insufficient evidence to support the jury's finding that the drugs at issue were crack cocaine, as opposed to some other form of cocaine base.[2] He maintains that, as such, he is not eligible for the ten-year mandatory minimum sentence set forth in 21 U.S.C. § 841(b)(1)(A)(iii). Santiago relies on our decision in *United States v. Edwards*, 397 F.3d 570, 577 (7th Cir. 2005), in which we held that the phrase "cocaine base" in 21 U.S.C. § 841(b)(1)(A)(iii) refers only to crack cocaine. However, the Supreme Court recently disagreed, holding that the term "cocaine base," as it is used in § 841(b)(1), "means not just 'crack cocaine,' but cocaine in its chemically basic form." *DePierre v. United States*, __ S.Ct. __, 2011 WL 2224426, at *11 (June 9, 2011). In light of *DePierre*, Santiago's challenge fails.

---

[2]  There is no dispute that the drugs were cocaine base, as the chemical analysis performed by Cook County Sheriff's Police Department chemist Nicole Wenzel showed.

### III.  Conclusion

For the foregoing reasons, we AFFIRM Santiago's conviction.