In the

# United States Court of Appeals

### For the Seventh Circuit

No. 11-2125

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

ERIC OZUNA,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 10 CR 495—**James B. Zagel**, *Judge.*

ARGUED FEBRUARY 21, 2012—DECIDED MARCH 19, 2012

Before EASTERBROOK, *Chief Judge*, BAUER, *Circuit Judge,*
and SHADID, *District Judge.*\*

SHADID, *District Judge.* Eric Ozuna was found guilty
of unlawful possession of a firearm in violation of
18 U.S.C. § 922(g)(1). He was sentenced to a term of

---

\* The Honorable James E. Shadid, District Judge for the United
States District Court for the Central District of Illinois, sitting
by designation.

113 months. On appeal, Ozuna argues that the district court abused its discretion by failing to exclude evidence regarding his gang affiliation as unfairly prejudicial. We disagree and affirm the judgment.

## I. BACKGROUND

At approximately 11:46 p.m. on November 6, 2009, Alainya Bandy called 9-1-1 to report hearing gunshots fired near her home in the 4800 block of North Lawndale. After about 10 minutes, Bandy heard people walking in the yard outside of her house. She looked out her bedroom window and saw a man in her back yard. Bandy watched as the man walked down her driveway, looked into the back alley behind her garage, and then walked back up the driveway into her yard. She placed a second call to 9-1-1 to report the man trespassing on her property.

Chicago Police Officers Martin Staunton and Timothy Martin were parked in an unmarked police car less than one block from Bandy's home when they received the call dispatching them to the 4800 block of North Lawndale. Officer Martin got out of the car a few houses away from Bandy's residence to search on foot while Officer Staunton continued around the block to the alley behind the house and drove up the alley at about 20 to 25 miles per hour with his headlights off. As he approached the back of Bandy's house, Officer Staunton saw two men dressed in dark clothing standing in the alley at the end of Bandy's driveway. Officer Staunton perceived a "significant" height difference between the

men. The shorter man began running first. The taller man was closer to Officer Staunton, permitting Officer Staunton to observe him holding a gun in his hand.

Upon noticing Officer Staunton's car in the alley, the men fled up the driveway and through a gangway toward the front of Bandy's house. Office Staunton began chasing the men. As he rounded the corner of Bandy's garage, Officer Staunton paused to get his bearings around a blind spot before pursuing the men into the back yard. Bandy looked out her window and caught a glimpse of Officer Staunton as he paused. She recalled hearing Officer Staunton yell "police" before seeing him in her back yard and hearing the sound of running through her back yard and the "rustling" of the chain link fence separating the yard from the gangway after she saw the officer.

After rounding the garage, Officer Staunton was approximately 30 feet away from the taller man, later identified as Ozuna. The shorter man was later identified as Sergio Sanchez, who, the record indicates, is six inches shorter than Ozuna. Officer Staunton could no longer see Sanchez, but saw Ozuna throw the handgun over a fence and into Bandy's neighbor's yard. As Office Staunton chased Ozuna and Sanchez up the gangway, Officer Martin intercepted them from the front of the house. Officer Martin saw Ozuna and Sanchez running toward him with Officer Staunton only a few feet behind. Officer Martin ordered them to the ground, and they were arrested without incident. At the time of his arrest, Ozuna had previously been convicted of a felony.

Officer Piotr Nestorowicz arrived on the scene very shortly thereafter. Officer Staunton advised Officer Nestorowicz that he saw Ozuna throw a gun into the neighbor's back yard and instructed him where to find it. Within seconds, Officer Nestorowicz recovered a .38 caliber Smith & Wesson revolver with a defaced serial number containing two live rounds of ammunition from the neighbor's yard.

Ozuna was charged with unlawful possession of a firearm in violation of 18 U.S.C. § 922(g)(1) in the United States District Court for the Northern District of Illinois. Prior to trial, Ozuna's counsel advised the government that Sanchez would be testifying as to the events of November 7, 2009. The government moved in limine for authorization to cross-examine Sanchez regarding his shared gang affiliation with Ozuna. After holding that the gang would not be referred to by name and that if it came up, it would be referred to generically as an "organization," the district court took the remainder of the motion under advisement, indicating that it would reserve ruling until hearing the substance of Sanchez' testimony on direct examination.

Trial commenced on December 17, 2010. The government presented Bandy, Officer Staunton, Officer Martin, Officer Nestorowicz, the officer who examined the handgun for fingerprints, and a Chicago Police dispatcher during its case in chief. Ozuna called a single witness, Sanchez, in his defense. During his testimony, Sanchez, who had not previously been convicted of a felony or any other crime for that matter, testified that he was

the one holding the gun on November 7, 2009 and that he threw the gun into the neighbor's back yard before Officer Staunton even pulled up behind Bandy's house. Sanchez further admitted that he and Ozuna grew up in the same neighborhood, had known each other since elementary school, had many of the same friends and acquaintances, and were good friends.

Near the end of direct examination, defense counsel asked for a sidebar on the issue of the gang evidence. The following discussion took place:

> Mr. Madden: Judge, I just want to get—be clear I would like to front the gang evidence. The gang evidence is going to be relevant. Obviously, I objected to it originally, and I understand—
>
> The Court: Not on what I've heard. The door has not been opened. It's conceivable that something could open on cross, but if he's careful—it's not open.
>
> Mr. Madden: Thank you, Your Honor.

Defense counsel then resumed direct examination with five more questions before resting. Before cross-examination, the government asked for a sidebar and argued that the door had been opened. The district court again stated that everything about the relationship between Ozuna and Sanchez was open, but that the gang membership was not.

During cross-examination, counsel for the government asked Sanchez where he had obtained the gun, and the following dialog transpired.

Q. Where did you get the gun from?

A. From where I used to live, 4827 North Lawndale. That's where we had it.

Q. Who lives there?

A. Nobody. Nobody that I know of, but I used to live there.

Q. You used to live there and knew that there was a gun there.

A. I already knew. That's where we always keep them, usually keep them at.

Q. Who is "we"?

A. The organization I used to belong to.

Q. What organization is that?

(December 20, 2010 Trial Transcript at 423-24) Ozuna's counsel objected, and the objection was sustained. However, the district court allowed counsel to inquire about other aspects of the organization, which led to the following dialog.

Q. Could you tell us more about what that organization is?

A. It's a gang that I used to be in.

Q. And were you in that gang with the defendant?

A. Yes.

*Id.* Counsel for the government then went on to cross-examine Sanchez on the rules and behaviors of the members of the gang, including oaths of loyalty, taking the

blame for another member's crime, etc., without further objection.

In closing argument, counsel for the government again raised the subject of Ozuna's gang affiliation. "Sergio Sanchez is this man's loyal friend, his fellow gang member, somebody he wants to protect, someone he took an oath to protect at one point. Sanchez says that he's out of the gang, but he sure knows all the rules, doesn't he? He knows what is going on in the gang these days." *Id.* at 495.

Prior to deliberations, the district court gave a cautionary instruction admonishing the jury that the evidence regarding Ozuna's membership in a street gang could not be considered in finding that he was more or less likely to have committed the charged offense. Ozuna was then found guilty of unlawful possession of a firearm by a felon.

Ozuna filed a Rule 33 motion for new trial asserting that cross-examination regarding Sanchez and Ozuna's gang affiliation should not have been allowed. The district court rejected the motion, finding that Sanchez' testimony had opened the door to the admission of the gang affiliation evidence and that the evidence should not have been restricted at all. Ozuna received a sentence of 113 months.

## II. DISCUSSION

On appeal, Ozuna contends that the district court abused its discretion by failing to exclude evidence re-

garding his gang affiliation under Federal Rule of Evidence 403 and that the error was not harmless. The district court's decision to admit evidence is reviewed for abuse of discretion, given the judge's position to assess the impact of the evidence in the context of the trial witnesses and evidence as a whole. *United States v. Santiago*, 643 F.3d 1007, 1011 (7th Cir. 2011), citing *United States v. Alviar*, 573 F.3d 526, 536 (7th Cir. 2009). This Court accords the underlying decision great deference, and it will be disturbed only if no reasonable person could agree with the ruling. *United States v. Thomas*, 321 F.3d 627, 630 (7th Cir. 2003).

There is no question that evidence of a defendant's gang affiliation is potentially prejudicial and inflammatory, as it poses the risk that the jury will associate gang membership with a propensity for committing crimes and find the defendant guilty by association. *Santiago*, 643 F.3d at 1011; *United States v. Harris*, 587 F.3d 861, 867 (7th Cir. 2009). Despite this risk, however, evidence of gang affiliation is not automatically inadmissible. *Id.* In fact, such evidence has been deemed admissible where it is found to be more probative than prejudicial. *Id.*, citing *United States v. Montgomery*, 390 F.3d 1013, 1018 (7th Cir. 2004); *United States v. King*, 627 F.3d 641, 649 (7th Cir. 2010); *Clark v. O'Leary*, 852 F.2d 999 (7th Cir. 1988). We are of the opinion that the evidence of gang affiliation was admissible, from the beginning, to show bias, interest, or motive. As a result, we now examine the issue on the way the evidence came in rather than the fact that it did come in.

Following the guidance set forth in *Santiago*, *Harris*, and *Montgomery*, the district court considered the proffered gang affiliation evidence in this case both pre-trial, at sidebar during the trial, and again on post-trial motions. It is important to note that the excerpts from the two sidebars cited previously in this opinion reveal that both counsel and the district court could see the relationships between Ozuna and Sanchez coming out in open court as the trial progressed. The district court attempted to reduce any prejudicial impact of the evidence by directing that the proper name of the gang not be used, denying the admissibility of Sanchez' gang tattoos, and reserving the ultimate question of admissibility until after hearing Sanchez' testimony on direct examination. This is a common and prudent practice in the trial courts when considering these types of issues.

The district court further directed that the government could ask questions on the subject only if Sanchez first raised it himself. Just as common in the trial courts is that one side, this time the government, then asked Sanchez questions designed so that Sanchez would "open the door" and mention his gang membership. Once open, the district court allowed the questioning that brought about the testimony of the shared gang affiliation between Sanchez and Ozuna and the loyalty among members. The jury was instructed that Ozuna's membership in a street gang could not be considered in finding that he was more or less likely to have committed the charged offense.

Ozuna revisited this issue in his motion for new trial. The district court again found that Sanchez' testimony

had not only opened the door to the evidence but also that the government should not have been required to open the door as a prerequisite to admission in the first place given the relevance of the evidence to the past relationship between the witness and Ozuna. We agree.

To be relevant, Rule 401 provides that evidence must have a tendency to make the existence of any fact of consequence to the determination of the action more or less probable than it would be without the evidence. Here, the evidence was offered to show Sanchez' bias in favor of his fellow gang member. Proof of bias is almost always relevant, as "[a] successful showing of bias on the part of a witness would have a tendency to make the facts to which he testified less probable in the eyes of the jury than it would be without such testimony." *United States v. Abel*, 469 U.S. 45, 51-52 (1984). Moreover, "common membership in an organization, even without proof that the witness or party has personally adopted its tenets, is certainly probative of bias." *Id.* Sanchez and Ozuna's membership in the Spanish Cobras clearly supported the inference that Sanchez' testimony was slanted or even manufactured in Ozuna's favor, particularly as Sanchez, unlike Ozuna, had not previously been convicted of a felony. It was therefore relevant and probative.

Under Rule 403, relevant evidence is admissible unless its probative value is substantially outweighed by the danger of unfair prejudice. The district court saw the evidence unfold and was in the best position to evaluate the probative value of the gang affiliation evi-

dence while weighing that value against any potential prejudice. In an abundance of caution, the district court took substantial precautions to avoid the risk of undue prejudice that made the issue appear to be more complex than it actually was. The facts of this case demonstrate a common pattern that occurs in trial courts, with one side claiming that certain evidence is crucial to its ability to present its case and the other side insisting that it cannot receive a fair trial if the evidence is allowed. The district court balanced the competing concerns to allow the government to explore a relationship between Ozuna and Sanchez while going to considerable lengths to protect Ozuna's right to a fair trial.

With the benefit of hindsight, the Court finds that these precautionary measures were largely unnecessary, as the prejudice to Ozuna did not substantially outweigh the considerable probative value of the evidence in establishing Sanchez' bias or motivation for testifying that he carried the handgun on the night in question. We hold that the admission of the evidence regarding the shared gang affiliation and tenets of gang membership was not an abuse of discretion.

### III. CONCLUSION

The judgment of the district court is AFFIRMED.