In the

# United States Court of Appeals
## For the Seventh Circuit

No. 13-2525

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

EDWARD C.M. MOLTON, JR.,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Southern District of Illinois.
No. 3:12-CR-30116-MJR — **Michael J. Reagan**, *Judge.*

ARGUED DECEMBER 11, 2013 — DECIDED FEBRUARY 18, 2014

Before WOOD, *Chief Judge*, and FLAUM and SYKES, *Circuit Judges*.

FLAUM, *Circuit Judge*. A jury convicted Edward Molton, Jr., of unlawful possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g). The district court sentenced Molton to 108 months' imprisonment, which is substantially higher than the advisory guidelines range of 63 to 78 months. Molton first attacks his conviction, arguing that the district court should have excluded evidence of his gang

affiliation, and that the evidence was insufficient to support a conviction. He then contends that his above-guidelines sentence is substantively unreasonable. We affirm.

## I. Background

On the evening of March 14, 2012, Kenneth Brown was shot in the neck and head while driving in East St. Louis, Illinois. FBI Special Agents Nick Manns and Bryan Yingling were working the W.A.V.E. detail (a local-state-federal joint force) in East St. Louis. They heard about the shooting over their radios and went to the scene, where they saw that Brown's car was riddled with bullet holes. Brown had already been taken to the hospital; he ultimately survived.

Agent Manns was familiar with Brown as the leader of the Waverly Crips gang in East St. Louis. Concerned about the welfare of the Brown family, Agents Manns and Yingling drove to a house on 38th Street where Brown stayed with family. The agents also expected some retaliation for Brown's shooting and believed that his associates might gather at the 38th Street home for that purpose.

When Agents Manns and Yingling arrived at Brown's residence, they saw people in the street in front of the house and on the front porch. Some approached the agents; they said they were Brown's family members and were preparing to visit Brown in the hospital. While speaking with them, both agents saw a man (Molton) standing along a sidewalk to the northeast of their car. Molton was standing across the street from Brown's house, near a chain link fence. Behind Molton was a large tree. Molton neither approached the agents nor spoke to them. The agents testified that he appeared wary of them. Molton was standing with his right

side turned away from the street and the agents. Although the agents could not see his right side or right hand, they believed he was holding a firearm. One of the family members in the street then yelled toward the house, "It's just the feds." Immediately thereafter, the agents testified that they saw Molton make a quick movement, turn, and move toward the large tree. That tree momentarily obstructed the agents' view of Molton, but then Molton returned to his initial position and stood. Both agents believed that Molton had dropped a firearm.

Agent Yingling approached Molton while Agent Manns, walking the short path he had seen Molton take, retrieved a semi-automatic rifle from behind the tree. It was loaded with nineteen live rounds, one of which was in the chamber. The agents said that Molton was nervous, shaking, and sweating profusely. They arrested him.

Brown's family members denied knowing Molton and vice versa, but they seemed unconcerned that Molton was found across the street with a loaded assault rifle. Their lack of alarm convinced the agents that Molton was not there to harm the Brown family, but instead to support Brown and in response to his being shot. The agents did not see anyone else in the area. Later that night, though, another man (Torcus Boone) was found hiding in the brush near Brown's house, across the street from where Molton had been standing.

Molton told Agent Manns that he lived on North 30th Street in East St. Louis, about eighteen blocks away from 38th Street. Molton said that just before his arrest, he had left his grandmother's house—located directly behind Brown's house—and walked to his girlfriend's house, but no one had answered the door. He was walking back to his

grandmother's house when he was arrested, he said. Molton denied possessing a firearm or disposing of one.

Jevon Strayhorn, a cellmate of Molton's while both were awaiting trial, testified at Molton's trial as a government witness. According to Strayhorn, Molton told Strayhorn that he was a "Tres Nine Waverly Crip," and that he "put in work" for his gang. Molton said that on the night of his arrest, a friend—"one of the big people" in the Waverly Crips—was shot in retaliation for a shooting that occurred some time ago. After his friend was shot, Molton said that he received a call, and that he and a partner went to the friend's house and got an assault rifle from someone on the porch. He then walked across the street and waited for a friend to bring something to wipe down the gun. When the agents' car arrived, Molton thought it was that friend. When someone yelled, "It's just the feds," Molton ducked back and hid the rifle by a tree. Molton shared with Strayhorn his concern that his fingerprints would be found on the rifle, and he experimented by pressing his hands on the stainless steel cell doors to see if his fingerprints were left behind.

Molton was charged with unlawful possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g). After a three-day trial, the jury found him guilty. The court sentenced him to 108 months' imprisonment and three years of supervised release. We will relay additional information below about the trial and sentence.

## II. Discussion

### A. Evidence of Molton's gang involvement

Before trial, Molton moved to preclude the government from mentioning, in its case-in-chief, both Brown's shooting

and Molton's alleged gang involvement. The court denied Molton's motion, reasoning that Molton's alleged membership in Brown's gang was relevant to multiple aspects of the case: "the overarching factual scenario at issue, Molton's presence at the scene, and why he would have a rifle." We review this ruling for abuse of discretion. *United States v. Alviar*, 573 F.3d 526, 536 (7th Cir. 2009).

Relevant evidence is generally admissible under Federal Rule of Evidence 402, but may be excluded if it is unduly prejudicial. *See* Fed. R. Evid. 403. Evidence of gang affiliation must be handled with care, because "a jury is likely to associate gangs with criminal activity and deviant behavior," raising the "specter of guilt by association or a verdict influenced by emotion." *United States v. Santiago*, 643 F.3d 1007, 1011 (7th Cir. 2011) (citation and internal quotation marks omitted). Accordingly, "we examine the care and thoroughness with which a district judge considered the admission or exclusion of [such] evidence." *Id.* (citation omitted). Yet we have repeatedly upheld the admission of gang affiliation evidence when it is more probative than prejudicial. *Id.*; *see also United States v. King*, 627 F.3d 641, 649 (7th Cir. 2010) (admission of gang evidence is appropriate "to demonstrate the existence of a joint venture or conspiracy and a relationship among its members" (citation omitted)); *United States v. Montgomery*, 390 F.3d 1013, 1018–19 (7th Cir. 2004) (admission of gang evidence proper to help establish motive); *United States v. Butler*, 71 F.3d 243, 250–51 (7th Cir. 1995) (evidence that defendant acted as security in a gang was admissible because it provided a motive for his gun possession).

In this case, the district judge correctly summarized the law and gave logical reasons for denying Molton's motion to exclude the evidence. We accord the district judge's evidentiary decision "great deference, and it will be disturbed only if no reasonable person could agree with" it. *United States v. Ozuna*, 674 F.3d 677, 682 (7th Cir. 2012). We have previously admitted gang affiliation evidence for the purpose of showing motive, including in gun possession cases. *Montgomery*, 390 F.3d at 1018; *United States v. Sargent*, 98 F.3d 325, 328 (7th Cir. 1996) (admission of gang membership evidence was not unduly prejudicial because it "was necessary to explain the motive behind the crime charged"); *Butler*, 71 F.3d at 251–52. The district judge also gave a limiting instruction, and we have suggested that such instructions help reduce concerns about the prejudice inherent in this kind of evidence. *See, e.g.*, *Ozuna*, 674 F.3d at 682; *Butler*, 71 F.3d at 251–52. For these reasons, the district court's evidentiary ruling was not an abuse of discretion.

**B. Sufficiency of the evidence**

Molton next argues that the evidence was insufficient to support his unlawful-possession conviction, and therefore the district court erred in denying his motion for a judgment of acquittal. We review sufficiency of evidence claims in the light most favorable to the government and will uphold a jury verdict if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Love*, 706 F.3d 832, 837 (7th Cir. 2013).[1]

---

[1] The briefing is somewhat unclear, but to the extent Molton also argues that he should have been granted a new trial, the standard is whether the verdict is so contrary to the weight of evidence that the interests of

In Molton's case, the parties stipulated to multiple elements of the crime, so the government needed to prove only one thing beyond a reasonable doubt: that Molton knowingly possessed a firearm on March 14, 2012. Molton argues that no one saw him possess a firearm, that the government's case consisted only of circumstantial evidence, that the agents did not know if anyone had been in the area of the recovered firearm prior to their arrival, that Molton's alleged sweating could actually have been moisture from rainfall that night, that Molton consistently denied having a firearm to Agent Manns, that Molton was simply returning to his grandmother's home when he was arrested, and that no fingerprints were found on the firearm. Molton also contends that the agents could not have seen him clearly because it was late, dark, and there were no streetlights. Finally, Molton says, Strayhorn's testimony was unreliable and motivated by his desire for a lesser sentence.

These are all potential reasons that a jury might have acquitted Molton—but this jury convicted him. The jury's determination was rational in light of the evidence it heard. Two FBI agents, Manns and Yingling, testified that Molton was near the home of a recently shot gang leader, standing with his body angled so the agents could not see his right side or right hand. Molton appeared wary of them, and as soon as someone yelled "It's just the feds," Molton disappeared for a moment behind a nearby tree. Moments later, the agents found a loaded rifle by that tree. Molton, sweating and nervous, told the agents, "you couldn't have

justice require a new trial. *See United States v. Washington*, 184 F.3d 653, 658 (7th Cir. 1999). We would deny this challenge as well, for the district court did not abuse its discretion on this record. *See id.* at 658–59.

seen me, it's too dark." As a member of Brown's gang, Molton also had a motive to be carrying a firearm. Further, Strayhorn testified that, while he shared a jail cell with Molton, Molton told him that he was given the firearm by someone on the front porch.

It was up to the jury to determine whether to credit the testimony of these witnesses. *United States v. Woolfolk*, 197 F.3d 900, 904 (7th Cir. 1999). The jury also saw a video from the FBI agents' dashboard camera. The jury therefore knew how dark it was on Brown's street that night—a factual matter—but chose to believe the agents. *Id.* Next, Molton's argument that the government's case consisted entirely of circumstantial evidence is unpersuasive because our Pattern Instruction requires the jury to consider both direct and circumstantial evidence, does not say that one is more compelling than the other, and states that the jury decides how much weight to give each type of evidence. 7th Cir. Crim. PJI 2.03. Finally, the lack of fingerprints on the firearm is unsurprising: trial testimony established that the rifle was well-oiled, which reduces the odds of fingerprints. For these reasons, we affirm Molton's conviction.

**C. Substantive reasonableness of the sentence**

When reviewing a sentence, we must first be sure that the district court committed no procedural error, *United States v. Hill*, 645 F.3d 900, 905 (7th Cir. 2011), and none is alleged or evident here. We then review whether the sentence is substantively reasonable in light of the 18 U.S.C. § 3553(a) factors. *United States v. Vallar*, 635 F.3d 271, 278 (7th Cir. 2011). This substantive review is for an abuse of discretion, irrespective of whether the sentence is above, below, or within the advisory guidelines range. *Gall v. United*

*States*, 552 U.S. 38, 51 (2007). If, as here, the sentence is outside the guidelines range, "the district court must provide a justification that explains and supports the magnitude of the variance." *United States v. Carter*, 538 F.3d 784, 789 (7th Cir. 2008). Thus, a more significant variance requires a more significant justification. *United States v. Taylor*, 701 F.3d 1166, 1174 (7th Cir. 2012). However, we will uphold an above-guidelines sentence as long as the district court "offered an adequate statement of its reasons, consistent with 18 U.S.C. § 3553(a)," for its sentence. *United States v. McIntyre*, 531 F.3d 481, 483 (7th Cir. 2008).

### i. The Presentence Investigation Report

The statutory maximum was 120 months' imprisonment, and the PSR reported a guidelines range of 63 to 78 months based in part on Molton's criminal history, which involved several prior offenses: aggravated unlawful use of a weapon as a juvenile; armed robbery; battery; unlawful possession of cannabis; and criminal trespass. Molton was on parole at the time of the present offense.

The PSR noted that Molton does not have a good relationship with either parent. "His mother was more interested in maintaining her relationships with the men in her life than her children, and his father was physically and mentally abusive." When Molton was twelve, his father made him strip naked, and then struck him repeatedly with an extension cord, breaking the skin. Due to the abuse, Molton and his siblings avoided their father, who also used alcohol and drugs. Molton threatened to commit suicide at age eleven in an attempt to get maternal attention, after his mother allowed a boyfriend to beat Molton. Molton is now twenty-three, and has been in and out of prison since age

seventeen. He and his siblings were mostly raised by their grandmother in East St. Louis.

### ii. Analysis of the district court's approach

The government sought a 120-month sentence and Molton sought a guidelines sentence. The district court sentenced Molton to 108 months' imprisonment, a $500 fine, a $100 special assessment, and three years of supervised release. The district judge explained his choice of sentence at the sentencing hearing and in a sentencing memorandum.

At the sentencing hearing, the judge did exactly what we have encouraged judges to do: explain the relevance of the § 3553(a) factors to their sentencing decision. *See, e.g.*, *Hill*, 645 F.3d at 905. For instance, the district judge considered this particular defendant's criminal history ("this is Mr. Molton's third felony involving a firearm") as well as mitigating considerations (his "horrific childhood"), his characteristics (his "violent and dangerous" nature), and his respect for law ("He has shown little or no respect for the law beginning at a young age. He is only 23. He has criminal history category of four and three weapon offenses. He was on parole at the time of the instant offense and just 12 days earlier was on electronic monitoring."). The district judge also considered specific deterrence (given Molton's past, "I am afraid he is likely to recidivate"; "in felonious gun possession cases with [violent] individuals…, guideline sentences do not deter"). The judge determined that a guideline sentence was insufficient punishment for a twenty-three year old convicted of his third firearm offense. Viewing this defendant in comparison to others, though, the judge declined to sentence Molton to the statutory maximum because that type of punishment "is reserved for the worst

of the worst." *See* 18 U.S.C. § 3553(a)(6) (instructing district judges to sentence defendants so as to "avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct").

Molton argues that the district court did not appropriately consider his background and upbringing. But the judge did consider Molton's "horrific childhood" and abuse. The judge chose to focus to a greater extent on Molton's most recent six years of repeated crime, but this sort of weighing is not an abuse of discretion. The district court must impose a sentence that is "not greater than necessary," 18 U.S.C. § 3553(a), but the judge's concern that Molton would continue to recidivate is not unreasonable given his record, and is consistent with the § 3553(a) factors.[2]

Molton next takes issue with a thirty-nine-page sentencing memorandum that the district court filed after sentencing Molton. The memo first described East St. Louis's history as primarily one of government corruption, scarce revenue, and crippling debt. It then relayed the city's current realities: lack of economic opportunities, social services, and police presence; a declining population; and rampant crime, violence, and corruption. This memo presented extensive data on violent crime (murder, rape, assault, robbery, etc.) in East St. Louis compared to other American (and international) cities. Finally, the memo described forty-five prominent public corruption cases in the last thirteen years. The memo mentioned Molton only three times in its thirty-

---

[2] Molton also argues that the district court did not adequately consider his "positive" qualities, but Molton did not point to anything specific for the court to consider.

nine pages, where it repeatedly emphasized that Molton was not being blamed for the city's decline.

In light of this memo, Molton argues that his sentence was substantively unreasonable because the court gave undue weight to irrelevant concerns like corruption and punished Molton for others' crimes. The memo is somewhat unorthodox. However, we ultimately reject Molton's argument because we find that—viewing the memo in conjunction with the court's statements at the sentencing hearing—the court weighed each of the § 3553(a) factors and provided sufficient rationales for its sentence.

The portion of the memorandum that describes the city's history of corruption and its recent corruption cases is not especially relevant to Molton's sentence—the memo provides no link between public corruption and gun-related offenses or violent crimes more generally. If the district judge had commented only on corruption and not on Molton's specific characteristics, we would need to remand; a district judge should consider general deterrence but must also hand down an "individualized" sentence. *Gall*, 552 U.S. at 50. But the judge's sentencing memorandum also details violent crime in the city, and this consideration is valid as part of the general deterrence analysis. In fact, our cases have often viewed general deterrence as a means of preventing like or related crimes.[3] Thus, the judge's

---

[3] For instance, we have approved of district judges considering other corruption convictions or data when sentencing a defendant of a corruption crime, or considering other violent crime convictions or data when sentencing a defendant of a violent crime. *See, e.g.*, *Hill*, 645 F.3d at 911 (affirming a sentence in a corruption case where the court "pointed to the widespread corruption in East St. Louis and the need to deter

extended analysis of violent crime in East St. Louis ensured the relevance of the sentencing memorandum.

True, this memo focuses on only one factor (general deterrence), but that was intentional. The memo merely buttressed the court's analysis at the sentencing hearing, which appropriately considered the other § 3553(a) factors. Thus, when viewing the hearing and the memo together, we find that the district court considered each of the § 3553(a) factors and provided sufficient rationales for its sentence. In such a situation, "we must give deference to the district court's determination that the [§ 3553(a)] factors justify" its above-guidelines sentence. *Taylor,* 701 F.3d at 1175.

## III. Conclusion

We AFFIRM Molton's conviction and sentence.

---

future public corruption"); *United States v. Ingram*, 427 F. App'x. 531, 533–34 (7th Cir. 2011) ("The district court, however, was permitted to consider the level of violent crime in East St. Louis when gauging the need for general deterrence to protect members of that community."); *United States v. Anderson*, 517 F.3d 953, 966 (7th Cir. 2008) ("The district court referred to a number of recent public corruption scandals…. The judge stressed the corrosive effect that corruption has on the public trust…. Anderson [—who was convicted of fraud and bribery—] believes that the judge put too much weight on the public corruption scandals, but the judge was simply emphasizing the seriousness of the nature of the crime and discussing the need for general deterrence."); *United States v. Jordan*, 435 F.3d 693, 698 (7th Cir. 2006) (affirming sentence for repeat child molester where trial judge said: "I think a severe sentence is necessary to send a very strong message that this conduct is outrageous, that this conduct is wrong, that this conduct cannot be tolerated in a civilized society that cares for its children."); *United States v. Brubaker*, 663 F.2d 764, 769 (7th Cir. 1981) (judge gave stiffer sentence in order to generally deter, i.e., "to provide a deterrent to any who might be otherwise inclined to act as you have acted.").