NONPRECEDENTIAL DISPOSITION
To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit
Chicago, Illinois 60604**

Argued September 13, 2013
Decided August 22, 2014

**Before**

WILLIAM J. BAUER, *Circuit Judge*

JOEL M. FLAUM, *Circuit Judge*

ILANA DIAMOND ROVNER, *Circuit Judge*

No. 13-1320

| | |
|---|---|
| UNITED STATES OF AMERICA, *Plaintiff-Appellee*, | Appeal from the United States District Court for the Southern District of Illinois. |
| *v.* | No. 12-CR-30212-001-MJR |
| RAMONE T. CARPENTER, *Defendant-Appellant*. | Michael J. Reagan, *Judge*. |

## O R D E R

Ramone Carpenter lied to FBI agents who were investigating a citizen's complaint that he had violated her civil rights while working as a police officer for the City of East St. Louis, Illinois. Carpenter eventually pleaded guilty to making materially false statements to the agents. *See* 18 U.S.C. § 1001(a)(2). In calculating Carpenter's guidelines imprisonment range—and in deciding to exceed that range and imprison him for 30 months—the district court relied on its determination that Carpenter had committed the alleged crime the FBI was investigating: using his position of authority as a police officer to conduct a traffic stop and coerce the driver into performing oral sex

on him. Carpenter contests that factual finding on appeal, but it is amply supported by the record. He also contends that, even if he committed the underlying civil-rights violation, the resulting prison term is unreasonably long. We reject that contention and affirm his sentence.

**Background**

On the morning of May 8, 2012, a resident of East St. Louis went to police headquarters and complained to Carpenter's superiors that he had coerced her to perform oral sex on him. Within hours the FBI commenced a civil-rights investigation and interviewed the woman about her sexual encounter with Carpenter.

According to the complainant, she first encountered Carpenter around 3:00 a.m. that morning when he and another uniformed police officer, Christopher Parks, stopped her car while she was driving toward her residence. Neither officer called in the stop. (Carpenter and Parks, in separate squad cars, were the only police officers patrolling East St. Louis at that hour.) The complainant was returning from a gas station where she had purchased and immediately opened a bottle of liquor (she had been drinking since 9:00 p.m. and had left her four children at home alone when she ran out of alcohol).

The woman told the FBI agents that she had feared being arrested (or losing custody of her children); she obviously was intoxicated and had an open bottle in the car, her license was suspended, and she lacked insurance. And, she added, she had admitted all of these driving offenses to the officers. Yet, she continued, Carpenter told her she had been stopped only because she looked upset and was crying. Still he frisked her while Parks searched her car. And this was no ordinary pat-down for weapons; Carpenter fondled her breasts, she said, and also groped her crotch and buttocks. He then said he would follow her home because, during the encounter, she had remarked that she was quarreling with the father of one of her children and thought he might be waiting at the residence. The officers allowed her to drive home and followed in their squad cars. They remained at the residence for some time, searching the rooms and closets. Carpenter then told the complainant she would be leaving with him, which she understood to mean they would go to the police station.

Instead he drove the woman to Jones Park (with Parks following). En route Carpenter received but ignored a dispatch about a domestic disturbance. He parked his squad car in the park, and after a brief conversation between the officers, Parks left to answer the dispatch, leaving Carpenter alone with the complainant. The officer asked if

they could have sex, and the woman, hoping to avoid his advance without openly refusing, claimed to be menstruating. Carpenter responded by asking for oral sex, and before the woman could react, he had unzipped his pants and removed his penis. The woman, who told the FBI agents that she expected to be arrested or to lose her children if she refused, performed oral sex on Carpenter. Afterwards she cleaned herself off with napkins and threw them on the grass. Carpenter recovered the napkins, however, and placed them in his car. He then drove the woman home. She immediately contacted family members, and her brother drove her to the police station to report the incident.

After interviewing the complainant, the FBI agents recovered the napkins from Carpenter's squad car (later testing would confirm the presence of semen) and questioned him. Carpenter confirmed that he and Parks had stopped the woman because she looked upset. He also acknowledged that they had followed her home. According to Carpenter, though, they had gone to the residence at her request. Carpenter told the FBI agents that he had remained at the residence for about 30 minutes and then left—alone. He denied going to Jones Park or receiving oral sex; he missed the domestic-disturbance dispatch, he added, because he had driven home during part of his shift. When the FBI agents confronted Carpenter with photos of the napkins recovered from his squad car, he asked for a lawyer.

About six weeks later Carpenter's attorney contacted the FBI to arrange a second interview. This time Carpenter admitted taking the complainant to Jones Park and receiving oral sex. But he insisted that the sexual encounter had occurred after his shift ended and was consensual. He did drive the woman to the park while still on duty, Carpenter explained, but only to smoke a cigarette. They went back later, he continued, in his personal vehicle. The napkins ended up in the squad car, Carpenter said, because later he drove to the police station to get his phone charger and put the napkins in the squad car's trunk while looking there for his report book.

The FBI agents were incredulous and said so. Carpenter then conferred with counsel and offered a third version of events. He told the agents that, after she had gone with him to the police station to retrieve a lighter, the complainant had suggested they "get together now" and offered him oral sex. He was still on duty, he admitted, but he drove her in his squad car to the park, where she performed consensual, oral sex on him. According to Carpenter, he had no idea that the woman had been drinking or that her license was suspended.

Carpenter eventually pleaded guilty to falsely denying to the FBI that he went to Jones Park and received oral sex while on duty on May 8, 2012. He refused to admit,

however, that the sexual encounter was nonconsensual. At sentencing the government sought to prove that Carpenter had coerced the complainant into performing oral sex. She testified, for the most part consistently with the account she had given the FBI immediately after the incident. Carpenter did not testify, and instead he introduced hearsay evidence of Parks's statements to the FBI and a grand jury. Parks—who by then had been fired from the police force—had maintained that the complainant wanted the officers to follow her home, was flirting with Carpenter throughout the encounter, and had asked Carpenter to take her to buy more alcohol. The district court chose to credit the complainant's testimony and thus concluded that Carpenter had violated her civil rights by coercing her to perform oral sex. *See Alexander v. DeAngelo*, 329 F.3d 912, 915–17 (7th Cir. 2003) (concluding that police officer's use of official authority to coerce sexual acts violates right to due process); *Johnson v. Phillips*, 664 F.3d 232, 239 (8th Cir. 2011) (same); *United States v. Guidry*, 456 F.3d 493, 506–07 (5th Cir. 2006) (same); *Jones v. Wellham*, 104 F.3d 620, 628 (4th Cir. 1997) (same); *Wudtke v. Davel*, 128 F.3d 1057, 1062–63 (7th Cir. 1997) (same as to school superintendent's use of official authority to coerce teacher to engage in sexual acts).

Ordinarily, making a false statement in violation of § 1001(a) yields a base offense level of 6. *See* U.S.S.G. § 2B1.1(a)(2); *United States v. Shannon*, 414 F.3d 921, 923 (8th Cir. 2005). But the district court, relying on the cross-reference in § 2B1.1(c)(3), applied the Chapter 2 offense guideline for the underlying civil-rights violation. *See* U.S.S.G. § 2H1.1; *United States v. Arturo Garcia*, 590 F.3d 308, 315–16 (5th Cir. 2009). The court then calculated a total offense level of 10, which combined with Carpenter's criminal history category of I, yielded a guidelines imprisonment range of 6 to 12 months. The court concluded that a sentence within that range was insufficient and imposed a prison term of 30 months.

## Discussion

Carpenter first argues that the district court clearly erred in finding that his sexual encounter with the complainant was coerced. But that finding rests on a credibility determination. And given our deference to district courts in the assessment of credibility, *see United States v. Garrett*, — F.3d —, 2014 WL 2883886, *5 (7th Cir. June 26, 2014); *Ray v. Clements*, 700 F.3d 993, 1021 (7th Cir. 2012), we see no reason to disturb the district court's decision to believe the complainant (despite some variances over time in her recollection) instead of the thrice-lying Carpenter and the complicit Parks. *See United States v. Grigsby*, 692 F.3d 778, 789–90 (7th Cir. 2012); *United States v. Busara*, 551 F.3d 669, 672–73 (7th Cir. 2008).

Perhaps recognizing the futility of directly assailing a credibility determination, Carpenter also contends that, even taking the complainant's version of events as true, the district court could not have found coercion because he never *explicitly* threatened her to persuade her to perform oral sex. But that argument is a nonstarter. Threats, including threats of arrest or imprisonment, are "a form of coercion that can vitiate consent to sex and turn the sex into battery." *Alexander*, 329 F.3d at 917. And sexual assaults are commonly criminalized whether accomplished by express or implied threats. *See* 3 WHARTON'S CRIMINAL LAW § 281, at 52–53 (Charles E. Torcia ed., 15th ed. 1995); *United States v. Navarro*, 608 F.3d 529, 534 & n.16 (9th Cir. 2010) (collecting statutes). Carpenter cites no contrary authority, and we see no clear error in the district court's conclusion that the complainant reasonably believed that she could not refuse Carpenter's advances after he had pulled her over while she was driving under the influence, fondled her, followed her home, driven her to a deserted park, and unzipped his pants without waiting to see if she would agree to perform oral sex. *See Rogers v. City of Little Rock, Ark.*, 152 F.3d 790, 793–94, 796–97 (8th Cir. 1998) (concluding that officer coerced sex when, while on duty, he stopped driver, followed her home in his patrol car, and told her she "owed him one," even though he ultimately told her she did not have to have sex with him).

Finally, Carpenter attacks the length of his term of imprisonment. But we review even above-guidelines sentences only for reasonableness, and will affirm a challenged sentence "so long as the district court offered an adequate statement of its reasons." *United States v. McIntyre*, 531 F.3d 481, 483 (7th Cir. 2008); *see Gall v. United States*, 552 U.S. 38, 50–51 (2007). Here the district court throughly applied the factors in 18 U.S.C. § 3553(a), highlighting the severity of Carpenter's offense and his abuse of his position as a police officer, and the need to deter similar derelictions of duty and promote respect for the law in the troubled community of East St. Louis. We find no abuse of discretion. *See United States v. Moulton*, 743 F.3d 479, 485–86 (7th Cir. 2014); *United States v. Hill*, 645 F.3d 900, 911–12 (7th Cir. 2011).

**AFFIRMED**.